**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

_____

KOUFRA GIRVEN,

      Plaintiff,

v.                                        Case No. 1:21-cv-00448-MLG-KK

LT. GENERAL SCOTT SPELLMON,
Chief of Engineers and Commanding General,
Department of the Army,
Corps of Engineers,

      Defendant.

### MEMORANDUM OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

      This matter comes before the Court on Defendant Lieutenant General Scott Spellmon's Motion for Summary Judgment on Plaintiff's Complaint for Discrimination Based on Race and National Origin, filed May 2, 2022. Doc. 32. Having reviewed the parties' submissions, the applicable law, and having held a hearing on the matter on April 3, 2023, the Court finds the motion to be well taken. For the reasons explained below, Spellmon's motion for summary judgment is granted.

### BACKGROUND

I.    **Overview**

      Plaintiff Koufra Girven is an African American[1] woman who applied for a job as a Supervisory Accountant within the Albuquerque Resource Management Office, a division of the

---

[1] Girven came to the United States from Chad when she was twenty or twenty-one years old. Doc. 32-1 at 2.

1

Army Corps of Engineers ("the Corps"). Doc. 1 ¶¶ 1, 2, 11. She was not selected to fill that position. Rather, her co-worker, Celina Griego—who is Hispanic—was given the job. Girven claims that she was not selected for the position because she is not Hispanic. Based on these allegations, Girven filed suit claiming race and national origin discrimination in contravention of Title VII. *Id.* ¶¶ 20-25.

Defendant Spellmon, in his official capacity as Chief of Engineers and Commanding General for the Corps, moves for summary judgment. Doc. 32 at 1. His position is that Girven was simply not the best candidate for the position and that no consideration was given to her race or national origin. *Id.* He seeks dismissal of all claims.

## II.     Factual History

### A.      The Supervisory Accountant role

The Albuquerque Resource Management Office's Supervisory Accountant, Debra Gallegos, announced that she would be retiring in January 2020. Undisputed Material Fact ("UMF") No. 5. Chief Financial Officer Yanna Rodriguez, who is Hispanic, selected three individuals from her division to cross-train with Gallegos in the months leading up to her departure. UMF Nos. 6-8. These temporary rotations began in July 2019 and continued through December of that same year. UMF No. 7. The cross-training positions were not formally listed or advertised, which were contrary to protocol. Doc. 54-4 at 4; Doc. 59 at 1-2. Nevertheless, Rodriguez identified people within her division that met her qualifications and inquired about their interest. Doc. 32-5 at 6. The three employees selected for the cross-training position were Celina Griego, Leigh Ann Saint Lot, and Maria Romero-Wroten.[2] Doc. 32-2 at 7-8.

---

[2] Girven's Declaration, Doc. 54-3, identifies all three as Hispanic. Spellmon's motion for summary judgment states that Griego is Hispanic, UMF No. 35 (Doc. 32 at 8), and Yanna Rodriguez states in her deposition that "Maria" (in context referring to Romero-Wroten, although Rodriguez could

Girven has worked for the Corps since May 2006. UMF Nos. 2, 3. She began a detail in Afghanistan in October 2017, Doc. 54-1 at 1, and returned stateside in October 2019. UMF No. 11. The opening for the Supervisory Accountant position was posted the month after Girven's return to the United States in November 2019. UMF No. 12. Girven submitted her application shortly thereafter. UMF Nos. 12, 13.

The hiring process began with Civilian Personnel Advisory Center ("CPAC")[3] reviewing all applications and determining whether the applicants met the minimum position requirements. Doc. 59-2 at 1-2. CPAC referred a list of sixteen candidates it deemed qualified to Rodriguez for consideration. UMF No. 14. Rodriguez then assembled a hiring panel consisting of herself and three other individuals: Michael Goodrich (Caucasian), Magie Ednalino (Asian), and Debra Gallegos (collectively referred to hereafter as "the Panel" or "the Selection Panel").[4] UMF Nos. 15-21. After receiving the list of qualified applicants, the Panel reviewed and scored the applicants' resumes on four different categories—financial concepts, accounting analysis, supervisory skills, and communications—using a scoring table Rodriguez had created. UMF Nos. 23, 27. The five candidates with the highest assessments would be offered the opportunity to interview for the position. UMF No. 27.

After the resume review scores were tabulated, Girven's resume was ranked seventh out of sixteen candidates. *Id.* However, one of the top candidates was unavailable for an interview. For that reason, the Selection Panel extended an interview offer to Girven as she was the next highest

---

not recall her last name) is Hispanic as well. Doc. 59-1 at 20. However, Leigh Ann Saint Lot's self-identified demographic form states that she is not Hispanic. Doc. 59-2 at 4.

[3] CPAC functions as the Corps' human resources department. Doc. 54-23 at 3.

[4] Girven identifies Debra Gallegos as Hispanic. Doc. 54 at 13. The undisputed material facts do not identify Gallegos's ethnicity, but Spellmon does not argue otherwise. *See generally* Doc. 59.

ranked local applicant. *Id.* Girven received notice her selection on December 10, 2019. UMF No. 28.

Girven chose the date and time of the interview, (*Id.*), but she was to be provided the location of the interview at a future date. Doc. 54-9 at 1. However, that information was not given timely. Girven reached out to Rodriguez on the morning prior to the scheduled interview, and Rodriguez responded that evening apologizing for not sending the information and stating that "Debra will send first thing." *Id.* Girven apparently did receive that information and was subsequently interviewed on her chosen date.

The interview process began with Rodriguez reading an introductory paragraph, followed by a preset list of questions that the Panel members asked each interviewee. UMF No. 31. Selection Panel members could not follow up on their questions and they were limited solely to repeating the question if an interviewee requested them to do so. *Id.* Each member of the Selection Panel rated the candidate's response to the questions on a scale from one to five.[5] UMF No. 32. Of the candidates interviewed, Girven received the lowest overall score. UMF No. 34. Ultimately, Griego was offered the Supervisory Accountant job, and Girven was apprised of her non-selection on January 23, 2020. UMF Nos. 36, 37.

B.     **The Resource Management position**

A simultaneous set of events is also material to the parties' arguments. On November 27, 2019, before interviews for the Supervisory Accountant position were to take place, Rodriguez emailed Girven about a different job in the Resource Management Office (the "RM Lead position"). Doc. 54-6. The role was with the South Pacific Division working on construction of a

---

[5] A CPAC employee named Diane Harmon was present before, during, and after the interview to review the questions and ensure compliance with regulations. UMF No. 30.

Southwest Border Barrier, with a duty station in Phoenix, Arizona, and a pay grade in the GS-13/14 range.[6] Doc. 54-7. After Girven confirmed her interest, Rodriguez emailed Girven's supervisor, John Drake, that she was looking to fill this position and stated that Girven would be an "excellent candidate." Doc. 54-8; *see also* Doc. 54 at 15. Drake responded approvingly saying "I fully support!" Doc. 54-8. Girven emailed Rodriguez and reported that she could start as early as the beginning of January 2020. Doc. 54-7 at 1. Girven stated that this email exchange "happened right before Thanksgiving" and that "[o]ver the [following] weekend something must have happened because Ms. Rodriguez' tune changed on Monday and then my emails went unanswered. I never knew what happened and why she changed her mind, but I did not suddenly become less qualified." Doc. 54-21 at 6. Rodriguez explained that her position of authority to make hiring decisions for RM Lead Position ended in December, before the team was ready to make a final decision. Doc. 59-1 at 10-11. And notably, Girven never formally applied for the job. Doc. 32-1 at 12-13. She did not obtain the RM Lead position. UMF Nos. 36, 37.

## ANALYSIS

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973), sets out a burden-shifting analysis for Title VII claims. First, the complainant carries the burden of establishing a prima facie case,

> showing (i) that [she] belongs to a racial minority; (ii) that [she] applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite [her] qualifications, [she] was rejected; and (iv) that, after [her] rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications.

---

[6] The Supervisory Accountant role for which Girven interviewed had a pay grade of GS-13. Doc. 32-6 at 1.

*McDonnell Douglas*, 411 U.S. at 802.[7]

At the second step, assuming the plaintiff has made a showing of discrimination, it is incumbent on "the employer to articulate some legitimate, nondiscriminatory reason for the employee's rejection." *Id.* The standard is easily satisfied. The Tenth Circuit has characterized the burden as "exceedingly light" and the proffered reasons for the employer's action "need only be legitimate and non-discriminatory on their face." *DePaula v. Easter Seals El Mirador*, 859 F.3d 957, 970 (10th Cir. 2017) (internal quotation marks omitted).

Finally, at the third step, the plaintiff must "be afforded a fair opportunity to show that [the defendant's] stated reason for [the plaintiff's] rejection was in fact pretext." *McDonnell Douglas*, 411 U.S. at 804. "Pretext can be shown by such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997) (internal quotation marks omitted). "However, mere allegations alone are insufficient . . . and mere conjecture that [the] employer's explanation is a pretext for intentional discrimination is an insufficient basis for denial of summary judgment." *Marquez v. Baker Process, Inc.*, 42 F. App'x 272, 277 (10th Cir. 2002) (internal quotation marks omitted).

Girven does not clearly situate her argument within the *McDonnell Douglas* framework.[8]

---

[7] Spellmon concedes that "Plaintiff may set forth a prima facie [Title VII] case" regarding the Supervisory Accountant position. Doc. 32 at 11.

[8] Girven has been unable to articulate her position and to do so in accord with the pertinent rules. The Court previously ordered Girven to re-file her summary judgment response because it did not comply with D.N.M.LR-Civ. 56(1)(b). Doc. 48. Notwithstanding this dispensation, Girven's amended response contains missing citations, frequently makes claims without citing to the record, and fails to comply with local rules. *See, e.g.*, D.N.M.LR-Civ. 7.3(b) ("Parties must submit evidence, in the form of declarations, affidavits, deposition excerpts, or other documents, in

She argues that her qualifications were superior to the hired applicant's, criticizes the Selection Panel's scoring of her resume and interview, argues that one of the interviewers used a racially charged term ("very stubborn") when describing Girven, and points to irregularities in the hiring process as indicative of bias. *See generally* Doc. 54. The Court finds that these arguments are best suited to step three of the *McDonnell Douglas* test. Thus, the salient question is whether Girven has provided a sufficient basis from which a factfinder could hold that the reasons given for her non-hire were pretextual and offered to conceal discriminatory conduct.

## I.      Girven's Qualifications

"[T]o suggest that an employer's claim that it hired someone else because of superior qualifications is pretext for discrimination rather than an honestly (even if mistakenly) held belief, a plaintiff must come forward with facts showing an overwhelming disparity in qualifications." *Johnson v. Weld Cnty., Colo.*, 594 F.3d 1202, 1211 (10th Cir. 2010) (internal quotation marks omitted). "[T]o give rise to an inference of discrimination, the plaintiff must be substantially more qualified than the successful candidate to perform the duties listed in the vacancy announcement, and the non-selected candidate must have a stark superiority of credentials." *Raymond v. Architect of the Capitol*, 49 F. Supp. 3d 99, 112 (D.D.C. 2014) (Jackson, J.) (internal quotation marks omitted). The difference must be stark and evident. As the Tenth Circuit bluntly put it, "[o]nly if the differences in the candidates' qualifications jump off the page and slap us in the face can we say that the employer's claim is sufficiently suspicious to suggest discriminatory animus." *Johnson*, 594 F.3d at 1211.

Girven points to her accounting background as evidence she is substantially more qualified

---

support of allegations of fact."); D.N.M.LR-Civ. 10.6 ("The portions of an exhibit the party wishes to bring to the Court's attention must be marked, e.g., by brackets, shading, or underlining, in the original, the copy for the Court and the copy for each party.").

than Griego. Doc. 54 at 18-20. But the Selection Panel deemed Girven's accounting qualifications top-notch. The scoring shows that Girven's resume was ranked higher than Griego in the accounting analysis category; Girven's resume scores were lower than Griego's in the other three categories considered. Doc. 32-7. Thus, the Panel agreed that Girven had superior accounting experience but gave Girven lower scores than Griego in the areas of financial concepts, supervisory skills, and communications. *Id.* That Girven excelled in one area of consideration but fell short in others does not suggest discriminatory intent. *See Johnson*, 594 F.3d at 1211. The measure of an overwhelming disparity in qualifications is holistic, not specific to one attribute. *See Conroy v. Vilsack*, 707 F.3d 1163, 1174 (10th Cir. 2013) ("Even granting [Plaintiff's] contention [that she was overwhelmingly more qualified in one aspect], she still fails to demonstrate that she was overwhelmingly more qualified than [the other candidate] *on the whole*, taking into account all of the factors that the agency found relevant.").

Nevertheless, Girven critiques the Selection Panel's scoring in other categories claiming the Panel's evaluations were lower than her qualifications warrant and that she "clearly possessed more superior qualifications than [] Griego." Doc. 54 at 16.  In support of this position, Girven highlights various parts of her resume demonstrating "experience with high level complex communication" including providing advice, briefings, and responses to complex questions from senior officials. *Id.* at 18. However, Griego's resume also contains evidence of strong communication skills. To state just a few examples, Griego "advise[d] management on funding purchases," "[a]ctively participate[d] in conferences, meetings and presentations," "[a]ct[ed] as [a] panel member for recruiting new employees," "[a]dvise[d] Accountants on loading Cost Share Funds in CEFMS," and "[v]olunteered to be an action officer for system problem reports and provid[ed] recommendations on accounting system solutions." Doc. 54-2 at 1-3. The Court is not

the proper arbiter of which types of communication best fit the requirements of the Supervisory Accountant role, but it is clear from Griego's resume that Girven is not "overwhelmingly more qualified" in communications. Griego has ample experience in this area.

As for the supervisory category, Girven points to claimed inconsistencies in Rodriguez's assessment of Girven's abilities as evidence of bias. For example, Girven notes that although Rodriguez identified Girven as an "excellent candidate" for the RM Lead position—a supervisory role—and that Rodriguez gave Girven high marks on the interview questions relating to supervisory skills, Rodriguez nevertheless gave Girven low marks (a one) in the resume evaluation's supervisory section. Doc. 54 at 19. Rodriguez's remarks and ratings do not suggest nefarious intent. Girven's potential to perform well in a distinct supervisory role and her ability to answer questions related to supervisory skills in an effective manner are distinct from the supervisory skills outlined in her resume. If the resume evaluations and the interview questions were perfectly correlated, there would be no reason to conduct an interview; the Panel could simply assess the candidates' resumes and make their hiring decision. It is possible that Girven's resume did not reflect the full extent of her supervisory skills, or that in Rodriguez's view, she performed better on this subject during her interview. And the RM Lead position is a different role, requiring distinct qualifications and supervisory requirements. Perhaps Girven's holistic skill set was better suited for the RM Lead position than for the Supervisory Accountant position. In short, the difference in Rodriguez's scores for Girven in the resume evaluation and interview phases of the hiring process does not indicate that she acted dishonestly, nor is her support for Girven in the RM Lead hiring process suggestive of contradictory beliefs about Girven's supervisory skills.

Girven's discussion of her skills in the financial concepts category is also unavailing. Girven claims that she had more experience and provided accounting for a larger sum of funds

than Griego. Doc. 54 at 17. None of the rating categories discuss the quantity of funds an applicant managed or the length of experience. *See generally* Doc. 32-7. Rather, the criterion for financial concepts was the applicant's ability to "[a]nalyze, evaluate and review accounting data and reports using business tools and applications, and performance metrics to provide recommendations." *Id.* Girven does not clearly indicate that her analysis, evaluation, and use of business tools was vastly superior to Griego's.

## II.     Subjectivity of the Hiring Process

Girven claims that the "subjective hiring process dominated by Hispanic employees gives rise to an inference of discriminatory bias [and] played a role in the selection."[9] Doc. 54 at 22. But Girven does not adequately support her argument that "Hispanics dominated both the work force and selection process." *Id.* For example, Girven claims that "the RM office is over 60% Hispanic and has historically hired Hispanic employees without advertising or otherwise opening the positions for competitive selection," but she does not cite to any evidence to support these averments. *Id.* These "[u]nsupported conclusory allegations . . . do not create an issue of fact."

---

[9] Girven cites to *Kelley v. Goodyear*, 220 F.3d 1174 (10th Cir. 2000) to support her claims that the "circumstances of this case" are "especially suspect" due to the prevalence of Hispanic individuals in the work force and the selection process. Doc. 54 at 22. The *Kelley* court did not categorically find all subjective hiring practices discriminatory when a particular racial or ethnic group is more prominent in the workforce. Rather, it espoused a more measured view:

> Goodyear's interview process, like almost all interviewing, is subjective. Questions of personality, interpersonal skills, and ability to take oral instruction do not lend themselves to objective qualification. However, Kelley has missed an important step in the analysis. This Court has held "the use of subjective criteria does not suffice to prove intentional . . . discrimination." The use of subjective factors can give rise to an inference of discrimination when there is a significant underrepresentation of a particular racial group in the company's workforce, but when there is no such underrepresentation no inference of discrimination may be drawn.

*Kelley*, 220 F.3d at 1178 (citations omitted).

*MacKenzie v. Denver*, 414 F.3d 1266, 1273 (10th Cir. 2005), *abrogated on other grounds by Lincoln v. BNSF Ry. Co.*, 900 F.3d 1166, 1181 (10th Cir. 2018).

Girven's claim that "[s]ixty-seven percent of employees in the Finance and Accounting Branch of the Resource Management office ('F&A RM office') are Hispanic" is also unsubstantiated. Doc. 54 at 13. She points to the F&A RM Office organizational chart, Doc. 32-4, to support this claim, but that document does not provide information regarding employees' racial or ethnic backgrounds.[10] She also cites to her own declaration, which identifies nine employees in the F&A RM Office as Hispanic. Doc. 54-3. Girven has not presented the facts accurately. At least two of these employees, Yolanda Noumi and Leigh Ann Saint-Lot, identify as white and non-Hispanic. Doc. 59-2 at 4. *See Tran v. Sonic Indus. Servs., Inc.*, 490 F. App'x 115, 118 (10th Cir. 2012) ("To oppose summary judgment, plaintiffs must do more than provide their subjective interpretation of the evidence, they must marshal admissible evidence of material fact.").

Even accepting Girven's characterizations of the other seven listed F&A RM Office employees as Hispanic—an uncertain prospect given her errors in identifying Noumi and Saint-Lot's ethnicities—it is a stretch to assert that seven out of twelve Hispanic employees in a division constitutes "domination" of the workforce. Albuquerque's demographic data indicates that roughly half the city's population is Hispanic. *See* Census Bureau, QuickFacts, Albuquerque city, New Mexico, https://www.census.gov/quickfacts/albuquerquecitynewmexico (last visited July 26, 2023). While seven out of twelve employees of a particular ethnicity could raise concerns if it were far out of proportion compared to local demographics, it hews neatly to expectations here. There is not a "significant underrepresentation" of non-Hispanic employees in the workforce. *See Kelley*,

---

[10] It is possible that Girven is relying on the employees' surnames, which could provide some clue as to ethnicity, but this metric is faulty; for example, surnames can change based on life events such as marriage and adoption. They are not always reliable indicators of a person's heritage.

220 F.3d at 1177 ("A plaintiff cannot create a triable issue of fact by making an assertion without supporting facts.").

Similarly, Hispanics were not significantly overrepresented on the Selection Panel. The record indicates that the Panel contained two Hispanic members, one white member, and one Asian member. UMF Nos. 6, 16, 20. With a group of four individuals, it is difficult to capture a wide span of racial diversity and, again, Albuquerque is a city in which approximately fifty-percent of the population is Hispanic. It is unsurprising, and legally unproblematic, that the Selection Panel matches those demographics.

Finally, Girven's claim that Rodriguez—who self-identifies as Hispanic—violated recruitment and selection procedures by appointing herself the Panel chair is contrary to the parties' evidence. The referenced policy states only that the Division Chief is to select the Panel Chair, and the Panel Chair is to convene the Selection Panel. Doc. 54-4 at 3. The rules, as they appear in the record, do not prohibit the Division Chief from choosing herself. Doc. 59-2 at 3 ("There is no law, regulation, nor policy that precludes a selecting official from serving on the selection panel."). "To the contrary," according to the declaration of the CPAC director, "it is common practice for the selecting official to appoint him/herself as the [P]anel chair." *Id*.

## III.   Irregularities in the Hiring Process

Girven raises two irregularities in the hiring process as suggesting discriminatory bias: (1) the temporary cross-training position was not advertised according to the applicable policies,[11] Doc. 54 at 3-4, 25-26; and (2) the Panel considered education and certifications in a disparate

---

[11] Whether Rodriguez violated policy in hiring for the cross-training position appears to be disputed. Doc. 59 at 1-2. Moreover, Spellmon asserts that even if a violation occurred, it was one without relevance because the policy requires only those candidates within the Albuquerque district be considered. Doc. 59 at 2 n.2. As discussed above, Girven was in Afghanistan at the time.

manner for different applicants. *Id.* at 26.[12] These arguments are addressed in turn.

### A.     The temporary cross-training position

"The mere fact that an employer failed to follow its own internal procedures does not necessarily suggest that the employer was motivated by illegal discriminatory intent or that the substantive reasons given by the employer for its employment decision were pretextual." *Fassbender v. Correct Care Sols., LLC*, 890 F.3d 875, 889 (10th Cir. 2018) (alterations omitted). To demonstrate illegal discriminatory motivation, the procedural irregularities must be somehow "related to the decision-maker's discriminatory purpose," *id*., or there must be evidence that the employer did not have an honest belief in the justification given for its conduct and acted in bad faith. *See Johnson*, 594 F.3d at 1211.

Here, Rodriguez testified that the cross-training opportunity was not posted across the entire organization, but that she solicited interest from people in her division that appeared to be qualified. Doc. 32-5 at 6. Rodriguez explained her limited disclosure of the cross-training position stating the role was intended to serve as a "developmental position" for internal employees and that she was unaware of any rule prohibiting requiring a different approach. Doc. 32-5 at 7. She further testified that she was unaware of whether two of the candidates selected for cross-training

---

[12] The parties also briefly discuss the fact that Girven did not receive information about the location of her interview for the Supervisory Accountant position until the day of the interview. *See* UMF No. 29 ("Ms. Rodriguez did not provide the specific conference room [for the interview] at that time [when corresponding with Girven about the date and time of the interview] because it would depend on the availability of conference room space."). Similarly, Girven mentions that Rodriguez "never sent Plaintiff the panel members' names before her interview so she could properly prepare" even though she contends this is the practice in the Albuquerque office. Doc. 54 at 16; *see also* Doc. 59 at 9 (Spellmon disputes contention that disclosing panel members' names is regular Albuquerque office practice). The Court does not find that these irregularities suggest pretext or racial bias because Girven has not provided any basis for comparison to others. It is possible that no other interviewees received information about the location or the panel members either. Because Girven does not discuss whether these irregularities applied only to her or also to other candidates, it is impossible to find them indicative of pretext or bias under the current record.

were Hispanic. *Id.*

Girven has provided no basis to suggest that Rodriguez's explanation and testimony regarding her decisions relating to the temporary cross-training position are falsehoods or that the Albuquerque office surreptitiously sought to exclude Girven because of her race. To the contrary, the relevant evidence indicates that, at the time the position was open, Girven was not one of Rodriguez's internal employees, Doc. 32-4; the employees chosen for cross training were not all members of the purportedly favored class (i.e., Hispanic), Doc. 59-2 at 4; and Girven was abroad and not able to seek out the cross-training opportunity when it first arose. UMF Nos. 7, 11, 12; *see Bennett v. Windstream Commc'ns, Inc.*, 30 F. Supp. 3d 1243, 1249-50 (N.D. Okla. 2014) (employee who regularly arrived late did not demonstrate bias due to failure to receive cross-training; cross-training technician had often already left for work in the field by the time employee arrived to work).

### B.      Consideration of education and certifications

Rodriguez instructed the Panel members not to credit education or certifications in the resume scoring process because CPAC had already considered those aspects in determining whether applicants met basic qualifications. Doc. 54 at 26; *see also* Doc. 54-24 at 4 (Rodriguez stated in her deposition that the Selection Panel decided not to assign education and certificate credentials in the scoring matrix and states that CPAC separately reviews those qualifications). However, Goodrich did not comply with this directive and considered educational background and financial certifications when he scored the candidates' resumes. Doc. 54 at 26. Focusing on this error, Girven argues that "[r]eliance on [these] factors which were outside the designated process is an irregularly [sic] supporting pretext." *Id.* Girven also asserts that Gallegos weighed financial certifications in her scoring, and from there, argues that an "inference of discrimination" should be drawn because "a panel member gave more weight to a general educational credential which

the Hispanic candidate has and disregards a clearly more relevant credential to the position of the non-Hispanic candidate." *Id*. at 25-27. As explained below, the first argument lacks legal support, and the second claim is without any factual basis.

Girven is correct that Goodrich considered education as part of the resume scoring process. Doc. 54-26 at 17. However, while contrary to Rodriguez's instructions, there is no evidence that Goodrich considered education in a biased manner, such as giving Griego credit for her educational background but failing to give Girven credit for hers. Rather, education was one factor he considered generally when scoring *all* candidates. *Id.* ("[S]peaking for myself, when I looked at *resumes*, I looked for level of education. I looked for financial certifications and I probably considered that in my other scores, my zero to three score." (emphasis added)). Girven fails to explain how an error, which was made with respect to all resume reviews, can be equated with pretext. *See Birge v. Apfel*, No. 97-2158, 1998 WL 165118, at *13 (10th Cir. Apr. 2, 1998) ("[A]n employer's failure to follow internal procedures does not necessarily suggest that the employer was motivated by illegal discriminatory intent or that the substantive reasons given were pretextual.") (internal quotation marks and alteration omitted) (unpublished disposition) (quoting *Randle v. City of Aurora*, 69 F.3d 441, 454 n. 20 (10th Cir. 1995)). Indeed, Girven proffers no evidence indicating that the error "directly and uniquely disadvantaged" her chances to obtain the Supervisory Accountant position. *See Randle*, 69 F.3d at 454 n.20.

Girven also attempts to cast doubt on the resume review process by arguing that Gallegos gave points to Griego for her certifications when scoring resumes but failed to credit Girven for similar achievements. Doc. 54 at 26. This contention is without support in the record. No points were awarded to any applicant on the scoring matrix for educational certifications. Doc. 54-13. Looking to the other categories for discrepancies, Gallegos scored Girven and Griego equally in

financial concepts and accounting analysis, and only gave them different scores in the supervisory and communications categories—areas where a certification would not appear to be relevant. *Id.*

## IV.   Animus

Girven claims Goodrich, Rodriguez, and Ednalino were biased and that this bias prevented a fair assessment of Girven's application. Doc. 54 at 27-31. The Court disagrees.

### A.   By Goodrich

Girven argues that Goodrich exhibited racial animus against her by using the term "very stubborn" to describe her and by sharing this impression with the panel. During the interview, Goodrich noted at the bottom of his interview question sheet that Girven was "very stubborn."[13] UMF No. 33 (disputed on other grounds); Doc. 54-5 at 2. When asked about this characterization at his deposition, Goodrich testified that he developed this viewpoint while working with Girven on a project called the RAMS Program, where she served as a program analyst. Doc. 32-3 at 3-4. Goodrich claimed he acted as Girven's supervisor during that period. *Id.* at 3. For her part, Girven testified that she never worked with Goodrich and that he "made up that story" (that they worked together and she was stubborn) as retaliation for her having gone to him with a complaint against a white male supervisor on behalf of herself and a few other women. Doc. 54-22 at 22-23. Girven alleges that Goodrich misrepresented his working relationship with Girven to hide his bias, which again, she says was manifested through his description of Girven as "very stubborn."

---

[13] Girven cites *Heard v. Board of Trustees of Jackson Community College*, Case No. 11-cv-13051, 2013 WL 142115, at *12 (E.D. Mich. Jan. 11, 2013) for the proposition that "the use of the words 'Very Stubborn' to describe an African American woman has been found to [be] sufficient evidence of racial discrimination to deny summary judgment." Doc. 54 at 27. Girven's assertion grossly misrepresents that decision. *Heard* involved a plaintiff stereotyped as a "Sapphire Caricature" and described stubbornness as one aspect of this caricature. 2013 WL 142115 at *12. The court in *Heard* found sufficient evidence that Jackson Community College viewed the plaintiff through the lens of this stereotype and therefore denied summary judgment. *Id. Heard* did not involve anyone using the specific phrase "very stubborn" and cannot be read to classify that term as per se racially discriminatory on its own. Girven has misrepresented the case to the Court.

The issue appears to be one arising from semantics rather than animus. As far as the Court can discern, neither Girven nor Goodrich testified that they worked together. Rather, Goodrich's testimony is that he occupied a supervisory position during the pendency of the RAMS Program and he was aware of Girven's work. Doc. 32-3 at 3-4. The evidence does not bear out Girven's assertion that Goodrich fabricated a story about working together simply to justify his comments that she was "very stubborn."

Similarly, Girven states that her only direct contact with Goodrich was when she brought a complaint to him "about ongoing harassment and unethical behavior engaged in by a [white] male supervisor." Doc. 54 at 28. However, the connection between that complaint and any animus by Goodrich is purely speculative: Girven offers nothing more than her opinion that Goodrich was uncomfortable with her as "an assertive Black woman" after she brought this complaint to his attention. Doc. 54-22 at 13-14, 23. This "subjective belief of discrimination is not sufficient to preclude summary judgment," *Aramburu v. Boeing Co.*, 112 F.3d 1398, 1408 n.7 (10th Cir. 1997), and there is no evidentiary support that Goodrich harbored a grudge against Girven. The Court cannot rely on Girven's subjective belief as its sole form of evidence at the summary judgment stage.

Finally, Girven argues that Goodrich held a "false bias" against her because his statements during the Equal Employment Opportunity ("EEO") investigation did not match his interview notes for Girven and Griego. Doc. 54 at 28. Regarding Girven, Goodrich's interview notes indicate that she was nervous during the interview, that she had a hard time formulating some answers, that she was very smart, and that his personal experience was that she could be very stubborn. Doc. 54-5 at 2. When speaking to the EEO investigator, Goodrich stated that "at times Ms. Girven stumbled on her words in the interview and did not go into enough detail when answering the interview

questions." Doc. 54-14 at 8. Regarding Griego, Goodrich's interview notes indicate that she was a good candidate, that she was a known high performer, and that she was a little nervous during the interview and could have gone into more detail. Doc. 54-28 at 2. His statement to the EEO investigator was that "Ms. Griego presented herself well during the interview and was confident in her answers." Doc. 54-14 at 8.

Girven characterizes these statements as contradictory. She argues that while Goodrich found both Girven and Griego to be nervous during the interview, only Girven was "downgrade[d]," and she further notes that there is no evidence in the interview notes Goodrich believed Girven needed to provide more detail. Doc. 54 at 29. Therefore, according to Girven, Goodrich treated the candidates in a discriminatory, biased manner. *Id.*

Girven overstates the import of the interview notes. Those materials are comprised of a handful of short phrases meant to summarize salient points from a 45-minute conversation. *See* Docs. 54-5, 54-28. While these notes indicate that Girven had a "nervous interview" and that Griego was "a little nervous in [the] interview," that does not mean that the two of them comported themselves with equal confidence. The qualifier "a little" before the statement about Griego's nervousness may indicate that Girven, who did not receive a similar qualifier, was more nervous— or the nervousness of the two candidates may have manifested differently, one in a manner that inspired more confidence in her answers than the other. Perhaps the notations of nervousness only referred to certain portions of the interview, or perhaps the candidates were both nervous the entire time. Regardless, the interview notes are plainly not a comprehensive account of the entire forty-five minutes each candidate spent speaking. *See Bullington v. United Air Lines, Inc.*, 186 F.3d 1301, 1318 n.14 (10th Cir. 1999) (district courts "do not sit as 'super-personnel departments' free to second-guess the business judgment of an employer"), *implicitly overruled on other grounds as*

*recognized by Boyer v. Cordant Techs., Inc.*, 316 F.3d 1137, 1140 (10th Cir. 2003). Therefore, the notes leave ample room for the existence of other impressions not written down; they do not contradict Goodrich's statements to the EEO officer but merely identify other observations.

### B.    By Rodriguez

Girven contends that Rodriguez "went to great lengths to divert [her] . . . from pursuing her application for the Supervisory Accounting position to clear the way to select a Hispanic candidate." Doc. 54 at 29. Girven's argument is predicated on conversations related to a separate (and temporary) work assignment in the Resource Management Office (the "RM Lead position"). Doc. 54-6. The reasoning underlying Girven's argument goes as follows: because Rodriguez brought this position to Girven's attention, encouraged her to apply for it, and then failed to follow up—all in roughly the same time frame as the application and interview process for the Supervisory Accountant position were ongoing—the RM Lead position served as a distraction technique to ensure Girven would not pursue the Supervisory Accountant role. Doc. 54 at 29-30. The relevant evidence does not support this theory.

Rodriguez contacted Girven about the RM Lead position on November 27, 2019. Doc. 54-6. She also contacted Girven's supervisor, John Drake, with her belief that Girven would be an "excellent candidate" for the RM Lead position. Doc. 54-8. On December 2, 2019, Girven informed Rodriguez that she could start the RM Lead position as early as the beginning of January 2020. Doc. 54-7 at 1. Girven never formally applied for the RM Lead position on USAJOBS, Doc. 32-1 at 12-13, but nevertheless asserts that she had been selected for the position. Doc. 54 at 30 ("[A]fter obtaining Mr. Drake's approval [Rodriguez] was working on finalizing the opportunity for Ms. Girven."). Girven's take on the matter is inconsistent with the correspondence provided as

part of her response to Spellmon's motion.[14] Nothing in these statements suggests that Girven had been chosen for the RM Lead position; they merely indicate preliminary interest in the possibility of Girven fitting into the position.

Moreover, Girven was not precluded from pursuing the Supervisory Accountant position at the same time as the RM Lead position. UMF No. 40. She was free to apply for both jobs. The relevant facts are that Rodriguez expressed support for Girven's candidacy to the RM Lead position, Doc. 54-22 at 16; Girven did not apply for the job, UMF No. 42; and Rodriguez's detail concluded thereby depriving her of the authority to fill that post, Doc. 59-1 at 10. The record simply does not contain sufficient evidence from which a reasonable jury could conclude that Rodriguez, based on racial animus or otherwise, raised the RM Lead position as a means to keep Girven from applying for the role of Supervisory Accountant.

## C.    By Ednalino

Girven cites Ednalino's statements to EEO personnel investigating Girven's claims of discrimination as evidence of bias. Doc. 54 at 31. Girven's support for this position is based on what she perceives as an inconsistency in the reasons Ednalino provided for Girven's non-selection and the favorable scores Ednalino gave when assessing Girven's resume. Specifically, Ednalino told the EEO investigator Girven was not selected for the Supervisory Accountant job because she did not possess the necessary work experience, but nevertheless awarded Girven the highest rating possible (a three) in both financial concepts and accounting analysis as part of the resume review process. Doc. 32-7. However, a review of the EEO report resolves Girven's claimed contradiction and explains why (at least in Ednalino's view) Girven was not awarded the job. In speaking to the

---

[14] Rodriguez emailed Drake stating that Girven would be an excellent candidate for the position and that Rodriguez would like to speak to Drake about it. Doc. 54-8. She then informed Girven that she would "start moving pieces and keep you informed." *Id.*

EEO, Ednalino apparently expressed her opinion that Girven possessed the requisite experience and knowledge in financial concepts and accounting analysis, but that her experience was primarily in program management—a different type of work, and therefore, not necessarily the best suited to the Supervisory Accountant position. Doc. 54-14 at 7 ("Ms. Ednalino stated Ms. Girven had some experience and knowledge of the subject position but most of her experience was on the program management side of the house."). Whether program management experience translates adequately to a supervisory accounting position is not a decision for this Court. *See Bullington*, 186 F.3d at 1318 n.14. Rather, the Court's role is to determine whether Girven has provided sufficient evidence to suggest that Ednalino acted with bias.[15] Based on the briefing and evidence provided, the Court resolves the question in the negative.

**CONCLUSION**

For the foregoing reasons, the Court grants Spellmon's motion for summary judgment. Doc. 32.

It is so ordered.

_____
UNITED STATES DISTRICT JUDGE
MATTHEW L. GARCIA

---

[15] Spellmon argues that the EEO summary of conversations with Ednalino lacks foundation and is "hearsay within hearsay." Doc. 59 at 21. While the Court is inclined to agree, the matter is better addressed on substantive grounds rather than procedural deficiencies.